RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0104P (6th Cir.)
File Name:  04a0104p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

No. 02-4100

JOHN T. NAMEY, JR.
*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 01-00541—Donald C. Nugent, District Judge.

Argued:  March 17, 2004

Decided and Filed:  April 15, 2004

Before:  ROGERS and COOK, Circuit Judges;
SCHWARZER, Senior District Judge.*

_____

### COUNSEL

**ARGUED:**    John  B.  Gibbons,  Cleveland,  Ohio,  for Appellant.  Phillip J. Tripi, ASSISTANT UNITED STATES

_____

* The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

1

ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** John  B.  Gibbons,  John  J.  Gill,  Cleveland,  Ohio,  for Appellant.  Phillip J. Tripi, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

_____

### OPINION

_____

WILLIAM W SCHWARZER, Senior District Judge.  John T. Namey, Jr., appeals his conviction on eight counts of violating 18 U.S.C. § 228(a) for "willfully fail[ing] to pay a support  obligation  with  respect   to  a  child  who  resides  in another State."[1]  We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

### FACTUAL AND PROCEDURAL HISTORY

Namey  and  his  former  wife,  Pamela  Lancaster,  were divorced in May 1992; Lancaster was awarded custody of the couple's three children and Namey was ordered to pay them $201 per week in child support.  Following the divorce, Namey moved his belongings to property he owned on East Jefferson Street in Ashtabula, Ohio ("the Jefferson property"). He  lived  and  worked  at  this  address  for  several  years. Namey,  a  practicing  physician,  had  his  medical  license suspended in 1994 and subsequently revoked in 1998.

In 1995, Namey began commuting periodically to Farrell, Pennsylvania to care for his ailing parents.  In or around 1997, Namey moved to Farrell on a more permanent basis. In 1999, he entered into a land contract to sell the Jefferson property

_____

[1]Namey  also  appealed  several  aspects  of  the  district  court's sentencing  decision.   Because  Namey  is  being  released  from  custody  in April 2004, those issues are moot.  However, we find Namey's challenges are  without  merit.   *United  States  v.  Delgado*,  350  F.3d  520,  524 n.4  (6th Cir. 2003).

and received a down payment. When the buyer defaulted, he entered into a new sales contract under which he received payments. Namey moved all of the furniture from the Jefferson property to Pennsylvania.

From 1992 to 1999, Namey carried on a romantic relationship with JoAnna Dunford. He gave Dunford lavish gifts, took her on trips, and provided her with living expenses. Namey had power of attorney over his parents' assets, and at times used the money for personal purposes.

In 1995, an Ohio court found that Namey owed $5,577.33 in past-due child support. Namey did not pay that amount, nor any other child support, until 1998, despite the efforts of the Ashtabula County Child Support Agency. A state civil court found on several occasions that Namey was deliberately avoiding employment and it increased his monthly obligation to $694. In 1998, Namey made several "purge" payments to avoid jail sentences threatened in state contempt orders.

Namey was indicted on the federal charge in November 2001. The indictment alleged that Namey owed almost $40,000 in unpaid child support for the period September 23, 1997, to April 2, 2001, in violation of 18 U.S.C. § 228(a). At the close of the prosecution's case at trial, Namey moved for acquittal under Federal Rule of Criminal Procedure 29. The court denied the motion and the jury convicted on all counts. Namey timely appealed.

## DISCUSSION

### I.

Namey's first contention is that the statute is unconstitutionally vague and has led to arbitrary enforcement. He argues that the failure of the statute to define "resides" led to an arbitrary result, pointing to evidence of his continued economic and familial ties to Ohio. We review de novo the legal question whether a criminal statute is unconstitutionally

vague. *United States v. Hill*, 167 F.3d 1055, 1063 (6th Cir. 1999).

When the common meaning of a word provides adequate notice of the prohibited conduct, the statute's failure to define the term will not render the statute void for vagueness. *United States v. Haun*, 90 F.3d 1096, 1101 (6th Cir. 1996). Where a term "has a commonly accepted meaning, an ordinary person would be able to recognize whether the conduct in question is criminal." *Id.* The term "reside" has a commonly accepted meaning. Dictionaries define "reside" as "[t]o live in a place for a permanent or extended time," WEBSTER'S II NEW COLLEGE DICTIONARY 943 (2001), or to "[l]ive, dwell . . . to have a settled abode for a time . . . ." BLACK'S LAW DICTIONARY (5th ed. 1979). An ordinary person would understand that a person resides where the person regularly lives or has a home as opposed to where the person might visit or vacation.

Namey argues that the term "reside" may have two separate meanings, with one equating to the definition of residence and the other equating to "domicile." The argument is without merit. We have made it clear that residence and domicile are distinct concepts:

> Generally, an individual's "domicile" is his "true, fixed, and permanent home and principal establishment." It is the place to which he returns whenever he is absent. "Residence," in contrast, requires both physical presence and an intention to remain some indefinite period of time, but not necessarily permanently. Thus, domicile is an individual's permanent place of abode where he need not be physically present, and residence is where the individual is physically present much of the time. An individual consequently may have several residences, but only one domicile.

*Eastman v. Univ. of Michigan*, 30 F.3d 670, 672-73 (6th Cir. 1994) (citations omitted).

Nothing in the statute or its legislative history suggests that Congress intended that the prosecution must prove a defendant's domicile. The House Judiciary Committee report accompanying the bill that became 18 U.S.C. § 228 reflects Congress's broad purpose to address the problem of collection of child support payments "involv[ing] children whose non-custodial parent *lives* in a state different from the child." H.R. Rep. No. 102-771, at 5-6 (1992) (quoted in *United States v. Faasse*, 265 F.3d 475, 485 (6th Cir. 2001)) (emphasis added); *see also* H.R. 1241, 102d Cong., Statement of Summary and Purpose (1992) (stating that H.R. 1241, which became § 228, was intended to "address[] the growing problem of interstate enforcement of child support."). Congress sought to deal with child support evaders who flee across state lines because "interstate extradition and enforcement . . . remains a tedious, cumbersome and slow method of collection." H.R. 1241, 102d Cong., Statement of Summary and Purpose (1992).

The House Judiciary Committee, which authored a report accompanying the bill that became 18 U.S.C. § 228, stated that the Committee had found that interstate collection of child support was "the most difficult to enforce" and accounted for an "unacceptably high" deficit in child support payments. H.R. Rep. No. 102-771, at 5-6 (1992). According to the report, approximately one-third of child support cases involve children whose non-custodial parent lives in a state different from the child and whose custodial parent must therefore rely on interstate payments of child support. Among this group relying on interstate payment, fifty-seven percent of the custodial parents reported receiving child support payments "only occasionally, seldom or never." *Id*. at 5. After noting that "at least 42 states have made willful failure to pay child support a crime," the report concluded that "the ability of those states to enforce such laws outside their own boundaries is severely limited." *Id*. at 5-6.

*Faasse*, 265 F.3d at 485; *see also United States v. H.*, No. 01CR0457, 2001 WL 1646465 at *8-9 (E.D.N.Y. Dec. 17, 2001). One Congressman characterized the bill as making "it a crime for a parent to cross state lines in order to avoid making court-ordered child support payments." 138 Cong. Rec. H7326 (1992). Another described the bill as remedying the problem of "parents who make a mockery of state law by fleeing across state lines to avoid enforcement actions by State courts and child support agencies." *Id*. The concerns expressed in the legislative record have little to do with the parent's intent to make the new state his or her domicile or permanent home—rather, it is the prolonged *absence* from the child's home state that concerned Congress. A parent who dwells, but is not domiciled, in a different state from his children is nonetheless absent from the child's state, and enforcement presents difficulties. Given Congress's concern with enforcement, it would make no sense to read the statute as imposing the strict domicile test, which excludes parents who merely reside in another state but present the same enforcement difficulties as if they were domiciled there.

In *H.*, on which Namey relies, the district court interpreted § 228 as "requiring domicile, not mere residence, in another state when the parent responsible for payments leaves the state of the child's domicile temporarily and without changing his domicile from that of the child." 2001 WL 1646465 at *10. The court reasoned that it seemed unlikely that parents who maintain their domicile in the same state as does the child but a residence elsewhere would fill the description of persons identified as the targets of the statute, i.e., persons against whom support orders are difficult to enforce. We are not persuaded by this reasoning. Aside from the fact that it ignores the plain language of the statute, it substantially undermines its effectiveness. Under the *H.* court's reading, a noncustodial defaulting parent long absent from the state of his child's residence would avoid prosecution unless it were proved that he intended to remain permanently in another state. There is no evidence that this is what Congress intended.

## II.

Namey's second assignment of error is that the district court erred in instructing the jury on the issue of residence.

The district court instructed that

Reside means to live, dwell, abide, sojourn, stay, remain, or lodge.  To settle oneself in a place, to be stationed, to remain or stay, to have a settled abode for a time . . . . A person may reside in more than one state at one time.  If you find that the defendant resided in more than one state during the period of this count of the indictment, and one of such states was the same state his children resided, you may find that the government has not proved this element beyond a reasonable doubt.

Namey himself proposed the instruction of which he now complains.  Under the doctrine of invited error, a party may not complain on appeal of errors he himself invited.  *United States v. Barrow*, 118 F.3d 482, 490 (6th Cir. 1997).  Even if the doctrine were not to apply here, however, our review is for plain error because Namey failed to object to the instruction at trial.  *United States v. Jones*, 108 F.3d 668, 670 (6th Cir. 1997); FED R. CRIM. P. 52(b).

Namey argues that the instruction was error because he was domiciled in Ohio and thus it was unclear whether the government proved that he resided in a state different from his children.  For the reasons discussed above, the instruction correctly defined "resides" for purposes of § 228(a) as residence rather than domicile.[2]   And there was sufficient

---

[2] We express no opinion as to whether § 228(a) requires "complete diversity" of residence–i.e., whether a defendant who resides in both the state where his child resides and another state can be convicted under the statute.  We note that any error in the district court's instruction on this point inured to Namey's benefit, as the jury was informed that the statute requires complete diversity.

evidence for the jury to find that Namey resided outside of Ohio.  We find no error.

## III.

In his third assignment of error, Namey contends that the district court erred in failing to grant his Rule 29 motion.  He argues that state remedies remained available for enforcement of the support orders but were ignored even though he was available for service of process in Ohio.  Thus, he did not fall within the class at whom the statute was aimed: "hard-core" parents who flagrantly refuse to pay and against whom traditional extradition procedures would have failed.

We review the district court's denial of a motion for acquittal de novo, but we must affirm its decision if the evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt.  *United States v. Nash*, 175 F.3d 429, 433 (6th Cir. 1999).  The elements of a § 228 offense are:  "(1) a willful (2) failure to pay (3) a past due support obligation, defined as 'any amount . . . determined under a court order or an order of an administrative process pursuant to the law of a state to be due . . . ,' (4) with respect to a child who resides in another state."  *United States v. Johnson*, 114 F.3d 476, 482 (4th Cir. 1997).  There was sufficient evidence for the jury to find these elements beyond a reasonable doubt.  The statute does not require proof that the defendant be a "hard-core" offender.

## CONCLUSION

For the reasons stated, Namey's conviction is **AFFIRMED**.