### UNITED STATES of America, Appellee,

v.

### Jo–Ann VENTURELLA, also known as Jo–Ann Ferretti, Defendant–Appellant.

### Docket No. 04–1219–CR.

United States Court of Appeals, Second Circuit.

Argued: Sept. 30, 2004.

Decided: Dec. 8, 2004.

---

Mark J. Lesko, Assistant United States Attorney for the Eastern District of New York (Roslynn R. Mauskopf, United States Attorney, on the brief; Cecil C. Scott, Assistant United States Attorney, of counsel), Brooklyn, New York, for Appellee.

Michael P. Berkley, Law Office of Michael P. Berkley, P.C., Garden City, New York, for Defendant–Appellant.

Before: STRAUB, POOLER, and WESLEY, Circuit Judges.

WESLEY, Circuit Judge:

Under 18 U.S.C. § 228 (Supp. II 2003), a person owing more than $10,000 in child support may be punished by two years' imprisonment if she "willfully fails to pay [that child] support obligation with respect to a child who *resides* in another State." 18 U.S.C. § 228(a)(3), (c)(2) (emphasis added). Jo–Ann Venturella argues the term "resides" denotes "domicile." Specifically, she contends that the Government could not establish that she "resided" in Florida without proving she intended to live there permanently.

## Background [1]

Ms. Venturella and James Ferretti divorced in 1998. The New York Supreme Court, Suffolk County, awarded Ferretti custody of their children, seven-year-old James Ferretti, Jr., and five-year-old Justin Ferretti, and ordered Venturella to pay James Ferretti $450 in child support once every two weeks with the first payment due February 2, 1998.

Venturella refused to pay child support. The only payment received was an involuntary garnishment of her wages in mid-

---

1. Venturella does not contest the sufficiency of the evidence, and we therefore set forth the facts in the light most favorable to the government.

March of 1998. At that time, she earned over $75,000 a year teaching in a New York public school. Venturella thereafter informed her employer she would quit her job if she could not avoid paying child support.

Venturella succeeded in that regard by leaving first her job and then New York. She immediately asked the school district for an unpaid leave of absence and expressed concern about resuming teaching in New York for fear that "the child support garnishment would be taken out if she returned to work." In the fall of 1998, she took a job at the Broward Children's Center in Pompano Beach, Florida. When she applied for that job in October she listed her home address as Pembroke Pines, Florida. She began work at Broward in November. That same month, she applied for and was issued by the Florida Department of Highway Safety and Motor Vehicles a Florida-only driver's license, stating that she had "part-time residence, employment or military assignment in th[e] state." Venturella then applied for a teaching position with Huntington Learning Center in Pembroke Pines in late November, listing the same home address.

She worked as a tutor for Huntington throughout December 1998 and January 1999.

Venturella lived in Florida—either in Pembroke Pines or Fort Lauderdale—until at least May 1999. Although there is some evidence that Venturella returned to New York on various occasions while she lived in Florida, a neighbor testified that from January 1999 through May of that year she saw Venturella at Venturella's home "all the time."

A grand jury indicted Venturella on the charge that, between January 1998 and October 27, 1999, she resided in Florida and knowingly and willfully failed to pay a past due support obligation greater than $10,000 with respect to her children who resided in New York, in violation of 18 U.S.C. § 228(a)(3).[2] The trial focused on where Venturella "resided," specifically, whether she resided in Florida at any time during that period. The parties vigorously disputed the proper interpretation of that term.[3] Venturella asked the district court to adopt the definition of "resides" enunciated in *United States v. H.*, No. 01–0457, 2001 WL 1646465 (E.D.N.Y. Dec.17, 2001),

---

**2.** Section 228 provides, *inter alia:*

**§ 228. Failure to pay legal child support obligations**

(a) OFFENSE.–Any person who—

(1) willfully fails to pay a support obligation with respect to a child who resides in another State, if such obligation has remained unpaid for a period longer than 1 year, or is greater than $5,000;

(2) travels in interstate or foreign commerce with the intent to evade a support obligation, if such obligation has remained unpaid for a period longer than 1 year, or is greater than $5,000; or

(3) willfully fails to pay a support obligation with respect to a child who resides in another State, if such obligation has remained unpaid for a period longer than 2 years, or is greater than $10,000;

shall be punished as provided in subsection (c).

. . .

(c) PUNISHMENT.-The punishment for an offense under this section is—

(1) in the case of the first offense under subsection (a)(1), a fine under this title, imprisonment for not more than 6 months, or both; and

(2) in the case of an offense under paragraph (2) or (3) of subsection (a), or a second or subsequent offense under subsection (a)(1), a fine under this title, imprisonment for not more than 2 years, or both.

18 U.S.C. § 228.

**3.** Venturella's counsel told the jury, "This case is going to rest on one issue . . . [w]hether or not my client went to Florida, packed her bags, left town, . . . and left her New York residence."

which would require the jury to find that Venturella "left the State of New York with an intention not to return to the State of New York, and to live permanently in Florida." The Government asked the court to employ the definition of "residency" articulated by this Court in *Rosario v. INS*, 962 F.2d 220 (2d Cir.1992). That definition has no reference to an intent to remain permanently or indefinitely and would have simply required the jury to determine whether Venturella had her "principal, actual dwelling place" in Florida.

Over Venturella's objection, the district court adopted the Government's definition.[4] The jury found Venturella guilty. The court sentenced her to fifteen months' imprisonment followed by one year of supervised release.[5] Venturella appeals from the judgment of conviction and we now affirm.

## Discussion

Venturella argues (1) the district court's jury instruction defining "resides" was er-

roneous and prejudicial, (2) § 228 is unconstitutionally vague as applied, (3) the district court's failure to charge the jury on a "dual residency" defense constituted plain error, and (4) she was denied the effective assistance of counsel. The first three arguments are without merit, and we decline to resolve the fourth.

1. *The "Resides" Instruction Properly Adopted A Definition Based on Residency Rather Than Domicile*

The parties do not dispute that § 228(a)(3) applies "where the child and obligated parent reside in separate States." *United States v. Sage*, 92 F.3d 101, 107 (2d Cir.1996). Venturella, however, contends that the district court "erred in failing to instruct the jury that the term 'residence' [sic] as used in 18 U.S.C. § 228 should be interpreted synonymously with the term 'domicile,'" and, specifically, that the court erred in permitting the jury to find that Venturella could "reside" in Flor-

**4.** Judge Hurley instructed the jury as follows:

> [Y]ou must determine whether the government has proved beyond a reasonable doubt that the defendant's children, James Ferretti, Jr. and Justin Ferretti, resided in New York and the defendant resided in Florida for some period within the time frame charged in the indictment.
>
> A person "resides" where he or she had an established abode, for personal or business reasons, permanent or for some period of time. In other words, a person "resides" in the place where he or she has their principal, actual dwelling place in fact, without regard to intent.
>
> The concept of residence has been explained by our circuit court of appeals by comparing it to other concepts concerning a person's living arrangements thusly:
>
> > Domiciliaries are those who have a fixed, permanent and principal home and to which, whenever absent, they always intend to return. At the opposite end of the scale are transients, those persons who

> are just passing through a locality. In between these notions of permanence and transience are residents. Residency means an established abode, for personal or business reasons, permanent for a time. A resident is so determined from the physical fact of that person's living in a particular place. One may have more than one residence in different parts of this country or the world, but a person may have only one domicile. A person may be a resident of one locality, but be domiciled in another.
>
> For present purposes, you must focus on the concept of residence or "to reside." As noted, the government must prove, as to this first element, that the defendant's children, James Ferretti, Jr. and Justin Ferretti, resided in New York and the defendant resided in another state for some period within the time frame charged in the indictment.

**5.** It also imposed a $100 special assessment and ordered restitution of $59,073.06.

ida even if she did not intend to live there permanently. We disagree.

■ "Well-established principles of construction dictate that statutory analysis necessarily begins with the 'plain meaning' of a law's text and, absent ambiguity, will generally end there." *Collazos v. United States,* 368 F.3d 190, 196 (2d Cir.2004). Although "resides" usually denotes residence, *see, e.g., United States v. Namey,* 364 F.3d 843, 845 (6th Cir.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 302, 160 L.Ed.2d 126 (2004), it may also denote domicile, *see, e.g.,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1931 (2002) (defining "reside," as, in part, "[to] have one's residence or domicile"). For the most part, " 'residence' and 'domicile' are two perfectly distinct things." [6] *Delaware, L. & W.R. Co. v. Petrowsky,* 250 F. 554, 560 (2d Cir.1918). Residence is "[t]he act or fact of living in a given place for some time," while domicile is "a person's true, fixed, principal, and permanent home, to which that person intends to return and remain even though currently residing elsewhere." BLACK'S LAW DICTIONARY 501, 1310 (7th ed.1999). In *Rosario,* we explained the terms' "different common law meanings":

> Domiciliaries are those who have a fixed, permanent and principal home and to

which, whenever absent, they always intend to return. At the opposite end of the scale are transients, those persons who are just passing through a locality. In between these notions of permanence and transience are residents. Residency means an established abode, for personal or business reasons, permanent for a time. A resident is so determined from the physical fact of that person's living in a particular place. One may have more than one residence in different parts of this country or the world, but a person may have only one domicile. A person may be a resident of one locality, but be domiciled in another.

*Rosario,* 962 F.2d at 224 (internal citations omitted). Accordingly, while residence generally does not require an intent to remain or return, domicile does. Yet as "resides" can mean either "residence" or "domicile," definitions alone do not resolve the dispute.

Of course, we cannot abandon our inquiry simply because the determinative word is susceptible to two definitions. *See United States v. Dauray,* 215 F.3d 257, 262 (2d Cir.2000). As Judge Learned Hand noted in *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.1945), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945), "one of the surest indexes of a mature and developed jurisprudence" is "not to make a fortress out of

---

**6.** In certain contexts "residence" may incorporate characteristics of domicile, including an intent to remain or return. For instance, "residence as used in statutes defining political rights is synonymous with domicile," *Delaware L. & W.R. Co.,* 250 F. at 560, and may be "the equivalent of domicil[e] in statutes relating to judicial jurisdiction[,] voting, eligibility to hold office, ... liability for inheritance and poll taxes, and certain personal property taxes," RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 11 (1971), cmt. k; *see also Wit v. Berman,* 306 F.3d 1256, 1260 (2d Cir.2002) ("Residence and the legal concept of domicile are synonymous under the [New York] Election Law."). Also, in the

context of public education, "[t]he traditional test for residency requires both physical presence plus intent to remain." *Catlin v. Sobol,* 93 F.3d 1112, 1119 (2d Cir.1996) (citing *Martinez v. Bynum,* 461 U.S. 321, 330, 103 S.Ct. 1838, 75 L.Ed.2d 879 (1983)). Thus, despite the generally distinct meanings of "residence" and "domicile," those terms "may have an identical or a variable meaning depending upon the nature of the subject-matter of the statute as well as the context in which the words are used." *Perkins v. Guaranty Trust Co. of New York,* 274 N.Y. 250, 259, 8 N.E.2d 849 (1937) (internal quotation marks omitted).

the dictionary." Thus, where a statutory term is reasonably susceptible to two or more meanings, we turn to the canons of statutory construction. *See Natural Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 98 (2d Cir.2001).

"Use of the same language in various enactments dealing with the same general subject matter ... is a strong indication that the statutes should be interpreted to mean the same thing." *Hargrave v. Oki Nursery, Inc.*, 646 F.2d 716, 720 (2d Cir. 1980). We have found only one other federal provision using the term "resides" to define a crime, 18 U.S.C. § 922, and that provision uses the term as § 228 does—to set forth an interstate element. In § 922, "resides" denotes residency. The statute provides, *inter alia*, that it shall be unlawful:

> for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he *resides* (or if the person is a corporation or other business entity, the State where it maintains a place of business) any firearm purchased or otherwise obtained by such person outside that State, except that this paragraph (A) shall not preclude any person who lawfully acquires a firearm by bequest or intestate succession in a State *other than his state of residence* from transporting the firearm into or receiving it in that State, if it is lawful for such person to purchase or possess such firearm in that State ....

18 U.S.C. § 922(a)(3) (emphasis added). Section 922 expressly ties "resides" to "residence." We have interpreted those terms *not* to require a "domicile"-type in-

tent. In *United States v. Matteo*, 718 F.2d 340 (2d Cir.1983), we spoke of a defendant having "dual residency, in both the state in which he purchased the guns and the state into which he transported the guns," *id.* at 341, and rejected the defendant's contention that his "dual residency" exempted him from the proscriptions of § 922. We explained that, if "dual residency" were a valid defense, one could easily circumvent the sweep of the statute by establishing residency in two states between which he intended to "run guns." *Id.* at 343 (internal quotation marks omitted). We thus began with the premise that a person may have dual residency in fact, and then concluded that such dual residency was an invalid defense. Implicit in our starting premise was the understanding that "resides" in § 922 has no element of an intent to remain. If it did require such an intent, of course, "dual residency" would be impossible, just as "dual domicile" is impossible. *See, e.g., Rosario*, 962 F.2d at 224 ("[A] person may have only one domicile.").[7] We believe that Congress used the term "resides" in § 228 consistently with how it used that term in § 922—to denote residence rather than domicile.

"A statute should be interpreted in a way that avoids absurd results." *Dauray*, 215 F.3d at 264; *see also United States v. Wilson*, 503 U.S. 329, 334, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992) (noting that absurd results are to be avoided); *Armstrong Paint & Varnish Works v. Nu–Enamel Corp.*, 305 U.S. 315, 333, 59 S.Ct. 191, 83 L.Ed. 195 (1938) ("[T]o construe statutes so as to avoid results glaringly absurd, has long been a judicial function."). The "absurd results" canon cited in *Dauray* and relied on in *Wilson* and *Armstrong Paint*

7. Even *H.*, on which Venturella almost exclusively relies, cites *Rosario*, 962 F.2d at 223–24, for the proposition that *Matteo* suggests that an "intent to return approach" would be incorrect in defining residence. *H.*, 2001 WL 1646465, at *5 (internal quotation marks omitted).

is a rule of statutory construction that serves "to help resolve ... ambiguity." *Dauray,* 215 F.3d at 262; *see also Wilson,* 503 U.S. at 334, 112 S.Ct. 1351; *Armstrong Paint,* 305 U.S. at 326–33, 59 S.Ct. 191.

Requiring the Government to prove domicile could produce absurd results. Consider Annabelle and Barry, both of whom have child support obligations regarding their respective children in New York and are in default on those obligations in excess of $10,000. Annabelle lives only in New York. Barry lives only in Florida. If we assume that "resides" does not require an intent to remain, then, quite logically, only Barry has criminal exposure under § 228.

However, if we assume that "resides" requires an intent to remain, we must query the intents of Annabelle and Barry. Assume now, additionally, that Annabelle is from Richmond, Virginia, intends to return there, owns a home there, and has never had any intention of remaining permanently in New York. In fact, she hates New York and is quite vocal about it. Assume also that Barry is living in Florida only because he could not find work in New York, but that Barry is from New York City, thinks that life outside "the City" is boring, and intends to return there when the year is out. If "resides" denotes domicile, then Annabelle may fall within the proscriptions of § 228, simply because she loves Richmond and has ties to her old home. Barry, on the other hand, may escape the reach of § 228, because he desperately hopes to return to New York at the end of the year. That Annabelle may be prosecuted over Barry on the basis of her longing for Richmond is preposterous. It is also at odds with the focus of the statute—to offer federal criminal penalties against parents who willfully fail to honor their child support obligation

and live in another State. Regional affections may be many things, but rarely are they criminal. Venturella conceded at oral argument that these results are absurd, and we can think of no way to rationalize them.

Other courts share our appreciation of the absurdity of Venturella's view. At the district court, Judge Hurley illustrated the absurd results flowing from such an interpretation with the following hypothetical:

> Assume a non-custodial parent resides in New York. He or she is the subject of a court-ordered support obligation. Assume further that the child is 17 years of age. Assume further that the obligation for support would terminate at the child's 18th birthday. Now, if "residence" means "domicile," it means that the non-custodial parent would be able to move to Utah and stay there for a year with no intention of having it as the permanent home. It is clearly not a domicile, and wait it out and come back to New York or go somewhere else.

Judge Hurley concluded that to interpret "reside" in § 228 to denote domicile, "would essentially eviscerate the statute." Likewise, the Sixth Circuit in *Namey* noted:

> A parent who dwells, but is not domiciled, in a different state from his children is nonetheless absent from the child's state, and enforcement presents difficulties.... [I]t would make no sense to read the statute as imposing the strict domicile test, which excludes parents who merely reside in another state but present the same enforcement difficulties as if they were domiciled there.

364 F.3d at 846. The *Namey* court thus concluded, "Nothing in the statute ... suggests that Congress intended that the prosecution must prove a defendant's domicile." *Id.* at 845. We agree.

Nonetheless, Venturella suggests that the legislative history supports her interpretation of § 228. It does not. Section 228 is the product of the Child Support Recovery Act of 1992 (the CSRA), Pub.L. No. 102–521, § 2, 106 Stat. 3403 (1992), as amended by the Deadbeat Parents Punishment Act of 1998 (the DPPA), Pub.L. No. 105–187, § 2, 112 Stat. 618 (1998). The legislative histories of these statutes confirm that § 228 targets those parents taking up out-of-state residences away from their children rather than those parents intending to remain in, or return to, out-of-state domiciles. Thus, despite Venturella's contention that Congress intended the proscriptions of § 228 to apply only to out-of-state domiciliaries, we find, as the *Namey* court found, "no evidence that this is what Congress intended." 364 F.3d at 846.

The earliest versions of § 228 were not limited to out-of-state domiciliaries or even out-of-state residents. These drafts had no requirement that an obligation be "with respect to a child who resides in another State." Instead, the bills extended to any defendant "outside the State in which such obligation is imposed," so long as the defendant fled a state for the purpose of avoiding child support. For instance, in March 1989, Representative Henry Hyde introduced H.R. 1438, 101st Cong. (1989). The bill provided, *inter alia*,

> Whoever, for the purpose of avoiding payment of an arrearage under a legal child support obligation, leaves or remains outside the State in which such obligation is imposed, shall be [punished] . . . .

*Id.* Although the bill never made it out of committee, Senator Daniel Coats introduced a nearly identical bill in the Senate in February 1990, S. 2185, 101st Cong. (1990), explaining that the "legislation would provide for the imposition of jail terms for those who ignore their legal

child support obligation by fleeing and remaining outside the States in which the obligation is imposed." 136 CONG. REC. S1745 (daily ed. Feb. 27, 1990). Over a year later, Representative Hyde introduced H.R. 1241, 102d Cong. (1991), a measure identical to his own H.R. 1438, and Senator Richard Shelby introduced S. 1002, 102d Cong. (1991), a bill substantially similar to the Hyde bills.

Senator Shelby noted the severity of the challenge facing the country:

> Nationwide, $18 billion in child support obligations remain uncollected. In 1985, 4,381,000 women were supposed to receive child support. Less than half of these women received full payment, while 1,138,000 received nothing at all. When looking at women and their children who live below the poverty line, these figures become even more alarming. Clearly our society needs to take a stronger position on the abandonment of children. Our country needs to make the enforcement of child support a major priority.

137 CONG. REC. S5502–01 (daily ed. May 8, 1991). He then explained that one of the greatest enforcement roadblocks was a uniquely interstate problem—the inability of States to garnish out-of-state paychecks:

> Each State varies from another in laws and enforcement capabilities. Although[ ] all 50 States have laws giving local authorities the right to garnish paychecks and seize property of a delinquent parent, these laws are of little help when a runaway spouse crosses a State line. Absent parents often avoid their child support responsibility by fleeing the State.
>
> . . . .
>
> This legislation will crack down on State garnishment laws. The delinquent father will be less likely to flee a State to avoid child support payments when

faced with the prospect of serving time in a Federal penitentiary.

*Id.* After Shelby introduced S. 1002, the bill remained idle for almost a year.

In the interim, an important study highlighted the problems that mothers faced when trying to collect from fathers who moved out of state. In January 1992, the United States General Accounting Office (GAO) published *Interstate Child Support: Mothers Report Receiving Less Support From Out-of-State Fathers, available at* http://161.203.16.4/d31t10/145578.pdf. The report concluded that "[m]others in interstate cases were less likely to receive support payments than those in in-state cases." *Id.* at 3. The GAO had counted as "interstate" those cases "in which mothers said a noncustodial father lived in a different state," *id.* at 12–13, but not those cases in which "the noncustodial father's residence ... [was] unknown," *id.* at 14. It noted that interstate enforcement is difficult whenever "the noncustodial parent lives in a different state" because "[s]taff from multiple agencies in two or more jurisdictions must coordinate a variety of activities, communicate detailed information, and understand the varying laws, policies, and procedures." *Id.* at 10. The GAO report did not use domicile to define a father's living place or residence. *See id.* at 12.

The report of the House Committee on the Judiciary referenced the GAO report in discussing an amended version of H.R. 1241. One of the amendments to H.R. 1241 changed the focus of the statute from a parent who fled the state to avoid paying child support to a parent who resides in a state outside the state of residence of the child. The amendment read:

> Whoever willfully fails to pay a past due support obligation with respect to a child who resides in another State shall be punished ....

H.R. REP. No. 102–771 (1992). The House Committee on the Judiciary reported the bill on August 3, 1992. *Id.* Its report stated:

> H.R. 1241 addresses the problem of interstate enforcement of child support by taking the incentive out of moving interstate to avoid payment. The bill is designed to target interstate cases only. These are the cases which state officials report to be clearly the most difficult to enforce, especially the "hard core" group of parents who flagrantly refuse to pay and whom traditional extradition procedures have utterly failed to bring to justice.
>
> The Committee believes that a child should be able to expect the most basic support from those [who] chose to bring the child into the world. That expectation should not end at the state line.

*Id.* at 6 (emphasis added). The report expressly referred to the GAO report:

> In spite of the[ ] improved collection efforts, the annual deficit in child support payments remains unacceptably high. This is especially true in interstate collection cases, where enforcement of support is particularly difficult.
>
> According to [the GAO report], approximately one-third of child support cases concern children whose father live in a different state and, thus, require interstate collection..... [I]nterstate extradition and enforcement ... remains a tedious, cumbersome and slow method of collection.

*Id.* at 5–6.

None of the various members of the House commenting on H.R. 1241 expressed any understanding that the bill was limited to parents with out-of-state domiciles. Instead, all indicated their expectation that the bill would penalize parents crossing state lines and expressed

frustration at the difficulties of enforcing child support obligations of absent parents. Thus, then-Representative Charles Schumer complained of the "snarls of redtape" in interstate enforcement cases, 138 CONG. REC. H7325 (daily ed. Aug. 4, 1992):

> At our hearings, we heard of instance after instance where spouses, usually husbands, did not want to pay, went to another State, waited just until the legal process was able to catch up with him, and then went to another State and started the procedure all over again. . . . .
>
> We must help the States to collect the support these children desperately need by taking the incentive out of moving interstate to avoid payment. After all, simply put, a child's right to support should not end at the State line.

*Id.* Representative Hyde echoed these sentiments: "Too often as soon as delinquent fathers move to new States, they seem to vanish as far as State enforcement agencies are concerned. It is not that States have no mechanisms available, it is that these mechanisms lose their effectiveness when a father moves to a new State." *Id.* at H7326. None of the Representatives who spoke on behalf of the bill expressed any understanding indicating an expectation that "resides" would denote domicile—none said, for instance, that the bill would target in-state parents lacking the resoluteness to establish an in-state domicile, or that the bill would target out-of-state parents intent on remaining permanently in a particular out-of-state jurisdiction.[8]

Indeed, the last member of Congress to speak on H.R. 1241 returned to the garnishment issue—a problem that necessarily tracks one's residence, not domicile. Representative Marilyn Lloyd, a co-sponsor of the bill, emphasized that H.R. 1241 would "put[ ] teeth in State garnishment laws." *Id.* "[I]n far too many cases, being awarded child support is not nearly the same as actually receiving child support payments. In fact, in 1990, one-quarter of women awarded child support received no money at all ...." *Id.* After her comments, the House passed the bill.[9]

The legislative history of the CSRA clearly shows that Congress understood that: (1) § 228 would apply to those "interstate" cases where a parent "lived" out-of-state, and (2) one of the major problems

---

8. For instance, Representative Victor Fazio stated that "[c]ollecting child support is especially difficult when both parents do not live in the same State," *id.*, Representative Thomas Ewing commented that the bill "would make it a crime for a parent to cross State lines in order to avoid making court-ordered child support payments," *id.* at H7327, and Representative Peter Hoagland explained that, "[t]he bill before us would make it a Federal crime to fail to pay child support for a child who lives in another State," *id.*

9. Neither any member of Congress nor the President said much more of relevance concerning the CSRA. Although the Senate did not enroll H.R. 1241, it incorporated the relevant text of that bill into S. 1002, passed S. 1002, and sent the bill to the House, which amended a section not here relevant, *see* 138 CONG. REC. H11071 (daily ed. Oct. 3, 1992), and sent S. 1002, as amended, back to the Senate. Before the Senate passed the final version of S. 1002, Senator Herbert Kohl, a co-author, reiterated that the law would "make[ ] it a Federal offense for noncustodial parents who live in another State to evade their child support obligations." 138 CONG. REC. S17131 (daily ed. Oct. 7, 1992). The Senate concurred in the House amendment, and when President George H.W. Bush on October 25, 1992 signed the final form of the bill into law, he noted, "This legislation is a positive and significant step in holding irresponsible, deadbeat parents accountable to those who depend on them financially." Statement on Signing the Child Support Recovery Act of 1992, 2 PUB. PAPERS OF GEORGE H.W. BUSH 1978–79 (1992).

in interstate enforcement was an inability to garnish out-of-state wages effectively. The CSRA would reinforce State garnishment laws by creating a strong incentive for parents to work in-state (or, of course, not to default willfully on their child support obligations). These concerns suggest that Congress expected the CSRA to cover out-of-state residents. No one ever mentioned domicile, any unique element of domicile, or any concern particular to domicile.

Yet Venturella suggests that the legislative history of the CSRA somehow demonstrates that Congress intended "resides" to denote domicile. She again relies entirely on the district court's opinion in *H.* In that opinion, Judge Weinstein concluded:

> The legislative history demonstrates Congressional concern with parents who flee child support orders, "cross state lines" and "whom traditional extradition procedures utterly fail to bring to justice." This characterization of those the bill is intended to impact suggests that the technical meaning of resides in a case such as the instant one was "domicile" rather than "reside." If a lax definition of "reside" were used, then the Act would impact parents who reside in another state on a short and transient basis for business or other purposes, but who are available in the child's home state for financial purposes. Maintaining domicile requires substantial contact with the state of domicile, plus an intent to return. It seems unlikely that parents who maintain their domicile in the same state as does the child (but a residence elsewhere) would fit the description of parents the bill is intended to affect: "interstate cases," "difficult to enforce" support orders against absent parents, and " 'hard core' parents ... whom traditional extradition procedures have utterly failed to bring to justice."

*H.*, 2001 WL 1646465, at *10. We disagree.

In our view, the court's conclusion in *H.* is at odds with the legislative history. Under that view of § 228, a parent could "reside" out-of-state without ever "crossing state lines"—the parent could simply retain an out-of-state domicile while continuing to live in-state. Such an interpretation contradicts previously noted Congressional expectations. Even the House report on which the court in *H.* relied presents the problem as one of parents "liv[ing] in a different state." H.R. REP. No. 102–771, at 5–6 (1992). This case illustrates the point: New York's inability to garnish any of Venturella's wages after she moved to Florida has nothing to do with her domicile—she claims her domicile remained New York—and everything to do with her new residence in Florida where she worked and refused to honor her obligation to support her children.

Indeed, if "resides" required proof of domicile, the CSRA would have been unable to address the very problem then-Representative Schumer said motivated the Act—"instance after instance where spouses ... went to another State, waited just until the legal process was able to catch up ... and then went to another State." 138 CONG. REC. H7325 (daily ed. Aug. 2, 1992). If "resides" denoted domicile, it would require an intention to remain. No parent intending to reside in a State only until support collection authorities caught up with him would ever change his domicile to trigger § 228. Venturella's interpretation would convert the very mischief at the heart of Congressional concern into a *defense* to § 228—if "resides" required domicile, a parent who proved that she only intended to maintain a residence in a particular state until the law caught

up with her would be immune from liability under the CSRA.

Second, we believe the *H.* court attributes a meaning to the phrase "hard core" that it cannot bear. That phrase appeared in the report of the House Committee on the Judiciary and referred to "parents who flagrantly refuse to pay and whom traditional extradition procedures have utterly failed to bring to justice." H.R. REP. No. 102–771, at 6 (1992). It explained that such procedures remain "a tedious, cumbersome and slow method of collection." *Id.* "Hard core" did not refer to a parent's intent to remain out-of-state permanently. It referred to a flagrant refusal to pay child support and a willingness to live elsewhere to effectuate that goal. · Accordingly, the CSRA captured both of those elements: it required a willful failure to pay child support and that a parent reside out-of-state.

Moreover, we do not view "residence" as a more "lax definition" than "domicile." The court in *H.* noted that if "resides" required residence "then the Act would impact parents who reside in another state on a short and transient basis for business or other purposes." *H.,* 2001 WL 1646465, at *10. That misconstrues "residence," which, as we explained in *Rosario,* generally requires "an established abode, ... permanent for a time." 962 F.2d at 224. Furthermore, a rule that all out-of-state residents may be prosecuted under § 228 is no more "lax" than a rule that all out-of-state domiciliaries may be prosecuted. It simply identifies a different set of parents.

Our conclusions remain unaltered by the 1998 amendments to § 228, which came in the form of the DPPA. The DPPA substituted subsections (a)(1) through (a)(3) for the former section (a) of § 228. The amended statute distinguishes between those persons willfully failing to pay support obligations "with respect to ·a child

who resides in another State" for over a year or greater than $5,000 and those doing so for over two years or greater than $10,000, increasing the punishment for the latter group. 18 U.S.C. § 228(a)(1)-(3), (c)(1)-(2). It also provides that persons merely traveling in interstate or foreign commerce may be punished under § 228, so long as they intend to evade support obligations for over a year or greater than $5,000. 18 U.S.C. § 228(a)(2). Although Venturella makes no arguments premised on the legislative history of the DPPA, we have reviewed that history and find it consistent with our interpretation of § 228 under the CSRA. ·

Venturella presents a final argument. She argues that we must apply the rule of lenity to construe the statute in her favor. We need not and do not. "[T]he point of the rule of lenity is for statutes to serve as a fair warning in language that the common world will understand." *United States v. Canales,* 91 F.3d 363, 368 (2d Cir.1996) (internal quotation marks omitted). The rule "requires the sentencing court to impose the lesser of two penalties where there is an actual ambiguity over which penalty should apply." *Id.* at 367 (internal quotation marks omitted). As the Supreme Court has explained:

> The rule of lenity, however, is not applicable unless there is a grievous ambiguity or uncertainty in the language and structure of the Act, such that even after a court has seized every thing from which aid can be derived, it is still left with an ambiguous statute. The rule of lenity comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers.

*Chapman v. United States,* 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (internal quotations marks and citations

omitted). "[T]he meaning of language is inherently 'contextual' ... [and] the [Supreme] Court has always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *Dauray,* 215 F.3d at 264 (internal quotation marks and citation omitted). The doctrine is thus one "of last resort." *Id.; see also United States v. Ramirez,* 344 F.3d 247, 253 (2d Cir.2003) (internal quotation marks omitted). Here we are confronted not with a grievous ambiguity in a statute but, rather, with a word susceptible to two meanings, one, which in context is absurd, and the other, which in context is consistent with the term's usage in another criminal statute and with Congressional expectations. The rule of lenity is inapplicable. *See United States v. Kavoukian,* 315 F.3d 139, 144 (2d Cir.2000) ("[T]he rule of lenity is not applicable where, as here, Congress's intention can be discovered.").

For these reasons, we reject Venturella's argument that the district court erred in its instruction to the jury on the meaning of "resides."

2. *The District Court's Failure to Hold § 228 Unconstitutionally Vague Was Not "Plain Error"*

■ Venturella argues, "Given the failure to define residence [sic], the average person and Mrs. Venturella, as well, could not possibly be on notice that their travels would result in a Federal Criminal Prosecution [sic]." Venturella did not challenge the vagueness of the statute before the district court. *Cf. United States v. Rybicki,* 354 F.3d 124, 128–29 (2d Cir.2003) (en banc), *cert denied* —— U.S. ——, 125 S.Ct. 32, 160 L.Ed.2d 10 (2004). Reviewing, therefore, for "plain error," *see id.;* Fed.R.Crim.P. 52(b), we find none.

■ This Court explained our plain error analysis in *United States v. Thomas,* 274 F.3d 655, 667 (2d Cir.2001) (en banc):

The framework of the analysis for plain error pursuant to Rule 52(b) is the four-pronged test set forth in *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Id.* (internal quotations marks and citations omitted). "For an error to be plain, it must, at a minimum, be clear under current law." *United States v. Weintraub,* 273 F.3d 139, 152 (2d Cir.2001) (internal quotation marks omitted). Indeed, it must be so obvious at the time of appellate consideration that "a trial judge and prosecutor would be 'derelict' in permitting it in a trial held today." *Thomas,* 274 F.3d at 667 (quoting *United States v. Gore,* 154 F.3d 34, 43 (2d Cir.1998)).

■ The vagueness doctrine is a "manifestation[ ] of the fair warning requirement." *United States v. Lanier,* 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). Thus, it is very much akin to the rule of lenity, which the Supreme Court has termed "a sort of junior version of the vagueness doctrine." *Id.* at 266, 117 S.Ct. 1219 (internal quotations marks omitted). Generally, "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolen-*

*der v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). We have held that when "the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only ... in light of the specific facts of the case at hand and not with regard to the statute's facial validity." *See Rybicki*, 354 F.3d at 129 (internal quotation marks omitted). "One whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness." *Id.*

Viewed in a light most favorable to the government, the evidence at trial established that Venturella took an unpaid leave of absence from her teaching job in New York on March 12, 1998, shortly after her employer notified her that her salary would be garnished for child support, left New York and lived in Florida between the fall of 1998 and May 1999, and failed to pay over $20,000 in child support to her children in New York during that time. Based on these facts, we find that the CSRA gives a person of ordinary intelligence a reasonable opportunity to know that this conduct constituted a "fail[ure] to pay a support obligation with respect to a child who resides in another State" under 18 U.S.C. § 228(a)(3) and is therefore prohibited by law. Accordingly, we find no plain error.

3. *The District Court's Failure To Instruct The Jury On A "Dual Residency" Defense Was Not "Plain Error"*

■ Judge Hurley instructed the jury they could find Venturella guilty if they found, *inter alia*, that her children "resided in New York" and that she "resided in another state for some period within the time frame charged in the indictment." Venturella argues that the district court erred by failing to instruct the jury on what she terms a "dual residency" instruction. The instruction would explain that

Venturella could not be guilty of violating § 228 if she resided in both Florida and New York. Venturella concedes that our review is for plain error. Applying that standard, we reject her argument.

We know of no case holding § 228 subject to a "dual residency" defense. Indeed, our treatment of 18 U.S.C. § 922(a)(3)—a firearms statute, and the only other provision using the term "resides" to define a federal crime—suggests that we would reject such a defense. In *Matteo*, a defendant contended that "by virtue of his dual residency in both the state in which he purchased the guns and the state into which he transported the guns, he is exempt from the proscriptions of the statute." 718 F.2d at 341. As noted above, we rejected the "dual residency" defense, explaining that "[t]o exempt the defendant before this court from the proscriptions of § 922(a)(3) ... would not be consistent with the Congressional purpose." *Id.* at 342. We noted that "[t]he actions of the present defendant ... fall squarely within the scope of the Act," *id.*, and that granting defendant a "dual residency" defense would "frustrate the purpose of the bill," *id.* at 343.

Here, Venturella's conduct—establishing a residence in Florida and finding work there in order to avoid the garnishment of her wages in New York—would certainly "frustrate the purpose" of the CSRA. In light of these facts, our holding in *Matteo*, and the absence of any case to the contrary, we find no plain error here.

4. *Ineffective Assistance of Counsel*

Venturella contends that she received ineffective assistance of counsel because of her counsel's allegedly unprofessional comments to the jury, his failure to call numerous "unbiased" witnesses to testify in her favor, his failure to utilize "readily available exculpatory evidence," his failure to introduce two letters, and his stipulation

that her children resided in New York. Venturella argues that, "were it not for his gross professional errors and neglect, reasonable doubt would have been created and [she] would have been acquitted." We decline to resolve this issue on direct appeal.

■ In order to establish a claim of ineffective assistance of counsel, a defendant must show:

(1) counsel's performance was deficient such that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment; and (2) the deficient performance prejudiced the defense, such that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*United States v. Morris,* 350 F.3d 32, 39 (2d Cir.2003) (internal quotations marks and citations omitted). "In applying this standard, a reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Gaskin,* 364 F.3d 438, 468 (2d Cir.2004) (internal quotations marks omitted). "Paramount to any review of a claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* (internal quotations marks omitted).

■ "[I]n most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective-assistance," *Massaro v. United States,* 538 U.S. 500, 504, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003), as "the district court is best suited to developing the facts necessary to determining the adequacy of representation during an entire trial," *Gaskin,* 364 F.3d at 467–68 (internal quotation marks omitted). "When faced with a claim for ineffective assistance of counsel on direct appeal, we may: (1) decline to hear the claim, permitting the appellant to raise the issue as part of a subsequent petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255; (2) remand the claim to the district court for necessary factfinding; or (3) decide the claim on the record before us." *Morris,* 350 F.3d at 39. Our review of ineffective assistance of counsel claims is discretionary and "should not be invoked lightly." *United States v. Salameh,* 152 F.3d 88, 161 (2d Cir.1998) (per curiam).

"In light of our baseline aversion to resolving ineffectiveness claims on direct review," *Morris,* 350 F.3d at 39 (internal quotation marks omitted), we decline to consider Venturella's ineffective assistance claim. We dismiss that portion of the appeal and note that Venturella may raise her claim in a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255.

### Conclusion

The district court's judgment entered on March 5, 2004 is hereby affirmed, and the appeal is dismissed with respect to appellant's ineffective assistance of counsel claim.